IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GEORGE MARTIN,               )
                             )
        Petitioner,          )
                             )
v.                           )          CIVIL ACTION: 1:21-cv-460-TFM-MU
                             )
JEFFERSON S. DUNN,           )
Commissioner, Alabama Department )
of Corrections,              )
                             )
        Respondent.          )

## REPORT AND RECOMMENDATION

George Martin (Martin), a former Alabama State Trooper and current prisoner of the State of Alabama, is serving a sentence of life without parole for the murder of his wife, Hammoleketh Jackson Martin (Hammoleketh). Martin has petitioned the Court through counsel pursuant to 28 U.S.C. § 2254 to challenge the conviction that led to his current incarceration. (Doc. 1).

Martin's case was referred to the undersigned Magistrate Judge for entry of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), Rule 72 of the Federal Rules of Civil Procedure, and General Local Rule 72(a)(2)(R). The undersigned has reviewed the parties' filings and finds there is sufficient information before the Court to resolve the issues presented, and no evidentiary hearing is required. For the reasons set forth below, the undersigned recommends that Martin's request for habeas relief be denied.

## I. Factual Background and Relevant Procedural History[1]

Around 11:30 p.m. on October 8, 1995, law enforcement officers from the Mobile Police Department and firefighters from the Mobile Fire Department were called to the scene of a vehicle fire in an isolated area of southern Mobile County, Alabama. Upon arriving at the scene, the officers and firefighters observed a 1991 Ford Escort burning and saw what appeared to be charred human remains inside the vehicle. The victim was later identified as Hammoleketh Martin, George Martin's wife. An autopsy determined Hammoleketh's cause of death to be homicide. After a lengthy criminal investigation, Martin was arrested in 1999—nearly four years after Hammoleketh's death—and charged with one count of capital murder for killing Hammoleketh for pecuniary gain, namely, to recover proceeds from several insurance policies.

### A. Martin's First Trial and Direct Appeal

Martin's case proceeded to a jury trial in May 2000 in the Circuit Court of Mobile County, Alabama, where the State presented the following circumstantial evidence against him:

> The investigations revealed that the fire was intentionally set. According to the evidence, the fire started in the right rear passenger compartment and spread forward. The minimal damage to the front of the vehicle precluded any conclusion that the impact of the car with a tree in the area could have started the fire; rather, the evidence was uncontroverted that the scene was consistent with a staged wreck.
>
> A traffic homicide investigator from the Alabama Department of Public Safety testified that he examined the vehicle and the scene in question. He conducted speed calculations of a vehicle and analyzed the kind of force that would have been necessary to cause such a fire. He concluded that the

---

[1] As explained in more detail in this section, Martin was tried twice for Hammoleketh's murder—once in 2000 when he was convicted and sentenced to death and then again in 2019 after his first conviction was overturned in state postconviction proceedings. This factual summary is adopted from the Alabama Court of Criminal Appeals opinion on Martin's direct appeal from his second conviction. *See Martin v. Alabama*, No. CR-18-0891 (Ala. Crim. App. June 26, 2020), Doc. 16-49.

fire was not an accident and the collision of the vehicle with a tree did not produce sufficient force to start the fire.

Martin when initially notified by officers of the Mobile Police Department that his car had been found with a body in it, stated that he had last seen his wife at approximately 8:00 or 8:30 p.m. that evening. He stated she left the house without telling him where she was going and that he fell asleep watching a football game on television. He initially stated that he had awakened at approximately 1:00 or 1:30 in the morning and, after noticing that his wife was not home, decided to go look for her.

The State introduced evidence of several inconsistencies in Martin's various statements. Among the inconsistencies were the time that he awoke to discover his wife missing, that the victim carried a gasoline can in her automobile with her because the gas gauge did not work, and that a BIC lighter found at the scene was used by his wife, the victim, as a flashlight because the dome light in her car did not work. The evidence also established that the defendant was less than honest when questioned about the existence of life insurance policies insuring the life of his wife, Hammoleketh Martin. Though Martin acknowledged the existence of a policy insuring his wife's life for $200,000, he lied when he stated there were no other policies. In particular, another policy insuring the life of Hammoleketh Martin for $150,000 was introduced into evidence and, according to the State's evidence, this amount was collectible only if Hammoleketh Martin died in a passenger vehicle.

The State also introduced evidence of a Traffic Accident Investigation Report prepared by Martin approximately one year prior to the death of his wife. The report involved a traffic accident in which an automobile left the road, hit a tree, and burst into flames. The State contended that the report of this incident, which was Martin's version of what occurred, was strikingly similar to the occurrences of one year prior.

The State linked the evidence of the insurance proceeds with the purported financial difficulties of the defendant. According to the prosecution's testimony, Martin's financial condition had deteriorated to the point where he was approaching bankruptcy.

State's witness James Taylor also testified that he saw an African American male driving a state-trooper car in the vicinity of the crime scene on the night of the murder. Moreover, during closing statements, the State argued: (1) that Martin, who is African American, fled the crime scene on a bicycle he had planted there earlier; (2) that, other than Martin's relatives, no one had ever seen a gasoline can in Hammoleketh's vehicle; and (3) that the jury could infer from Taylor's testimony that Martin was the state trooper Taylor had seen.

*State v. Martin*, 287 So. 3d 355, 357–58 (Ala. Crim. App. 2017), *rev'd sub nom., Ex parte State*, 287 So. 3d 384 (Ala. 2018) (internal citations, quotations, and alterations omitted). In response, Martin maintained he did not kill Hammoleketh and that he did not know who, if anyone, did. Martin theorized that Hammoleketh's death could have been the result of an accident, that an unknown person carjacked and killed Hammoleketh, or that Hammoleketh committed suicide. *Id.*

The jury convicted Martin of capital murder for pecuniary gain pursuant to Alabama Code § 13A-5-40(a)(7) and recommended life imprisonment without parole. The trial judge overrode the jury's recommendation and sentenced Martin to death. Martin's conviction and death sentence were ultimately affirmed on direct appeal. *See Martin v. State*, 931 So. 2d 736, 740-41 (Ala. Crim. App. 2003), *rev'd in part*, 931 So. 2d 759 (Ala. 2004), *aff'd on remand*, 931 So. 2d 774 (Ala. Crim. App. 2005).

### B.  Martin's State Postconviction Proceedings

After his capital murder conviction and death sentence were upheld on direct appeal, Martin sought postconviction relief pursuant to Alabama Rule of Criminal Procedure 32. Those proceedings were long and complex, and a full recitation of them is not necessary here.[2] But what *is* relevant here is that Martin's Rule 32 proceedings included a hard-fought discovery dispute which ultimately revealed that, prior to Martin's first trial, the State of Alabama ("the State") violated *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by suppressing the following evidence from Martin and his defense team:

---

[2] A detailed procedural history of Martin's Rule 32 proceedings can be found in the Alabama Court of Criminal Appeals order affirming the trial court's grant of Rule 32 relief. *See State of Alabama v. Martin*, No. CR-12-2099 (Ala. Crim. App. Dec. 12, 2014), Doc. 16-54.

**Statements by Witness James Taylor Potentially Implicating Trooper Grayling Williams**: An eyewitness named James Taylor told law enforcement during the investigation that he was in the area of the crime scene the night Hammoleketh died and that he had seen a Black state trooper in the area too. At Martin's first trial, the State relied heavily on Taylor's statement as circumstantial evidence placing Martin at the crime scene. The Rule 32 proceedings revealed the State had suppressed an additional statement from Taylor that the person he saw was "a big man who filled up the car" (which was relevant because Martin is only 5'6" tall) and that Taylor had separately identified Trooper Grayling Williams, not George Martin, from a photographic lineup of Black male troopers.

**Statements by Hammoleketh's Sister Regarding a Gas Can in Hammoleketh's Car**: Martin maintained throughout the investigation that Hammoleketh's death was accidental and could have been caused by a gas can Hammoleketh sometimes carried in her car because her gas gauge was broken. At Martin's first trial, the State argued that no one other than Martin's relatives had ever seen a gasoline can in Hammoleketh's vehicle. The Rule 32 proceedings revealed the State had suppressed a statement by Terri Jean Jackson, Hammoleketh's sister, that she had also seen a gas can in Hammoleketh's car approximately one month before Hammoleketh's death.

**Statements by Witness Norma Broach Potentially Implicating Another Suspect**: An eyewitness named Norma Broach told law enforcement during the investigation that she was at a gas station near the crime scene the night of Hammoleketh's death and that she had watched a white male fill up two large gas cans and then move a heavy object from a small black car into the passenger seat of the cab of a camper truck. The Rule 32 proceedings revealed that Broach's eyewitness account was withheld from Martin prior to his first trial.

**Anonymous Calls to Police Implicating a Different Suspect**: During the investigation, law enforcement received two anonymous phone calls suggesting that Trooper Grayling Williams was involved in Hammoleketh's murder. Evidence relating to these calls was suppressed from Martin prior to his first trial.

**Evidence of Bicycle Track Investigation**: One of the State's theories at Martin's first trial was that Martin had fled the crime scene on a bicycle he had planted there. The Rule 32 proceedings revealed the State had suppressed evidence showing that law enforcement investigated the scene and did not find any bicycle tracks.

*State v. Martin*, 287 So.3d 355, 383 (Ala. Crim. App. 2017); *see also State of Alabama v. Martin*, No. CR-12-2099 (Ala. Crim. App. Dec. 12, 2014), Doc. 16-54.

In the Rule 32 court's opinion, the State's misconduct was willful and the resulting prejudice to Martin could not be corrected with a new trial, so the indictment against Martin was dismissed with prejudice. *Id*. at 360. The Alabama Court of Criminal Appeals (ACCA) upheld that ruling, but the Alabama Supreme Court (ASC) later reversed, holding that "the trial court did not make a sufficient finding of prejudice to warrant the extreme sanction of dismissing the indictment." *Id*. at 393.

### C. Martin's Second Trial and the Preclusion Order

When the case returned to the Circuit Court of Mobile County, it was set for retrial before Judge Robert H. Smith, the same judge who had presided over Martin's Rule 32 proceedings. Judge Smith was scheduled to retire before the new trial though, so he ordered the case to be stayed until January 2019 when Judge Wesley S. Pipes was to assume the bench. (Doc. 16-1, p. 155). Judge Pipes became the presiding judge on January 15, 2019, and the case was set for retrial to begin on May 20, 2019. (Doc. 16-30, p. 149; Doc. 16-1, p. 167).

In advance of trial, both sides filed a flurry of pretrial motions including, as relevant here, opposing motions about whether Martin should be allowed to introduce evidence or make arguments related to his first trial, his Rule 32 proceedings, or any prior court rulings about credibility of the State's witnesses or the State's *Brady* violations. (Doc. 16-8, pp. 176-201; Doc. 16-8, pp. 1-40; Doc. 16-5, pp. 74-82). Judge Pipes held oral argument on these motions (Doc. 16-31, pp. 175-201; Doc. 16-32, pp. 1-36), and entered the following order ("the Preclusion Order") on May 7, 2019:

> The State seeks to prevent the Defendant from introducing evidence and testimony of prior court rulings in the prosecution of this matter, including rulings regarding certain witnesses' credibility and the finding that the State withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S,

83 (1963). Defendant, through his opposition to the motions, and through his own Motion to Prevent Improper Exclusion argues that he should be able to introduce evidence related to the history of this proceeding, including findings related to certain witnesses, and the State's conduct because it is 1) relevant to his defense, 2) he has a Sixth Amendment right to confront the State's witnesses on these topics, 3) evidence of the State's misconduct is relevant to the State's consciousness of its weak case, 4) the evidence is necessary to explain the temporal gap in time between the death of Ms. Martin and the trial date, and 5) the evidence is warranted as a sanction against the State for its misconduct.

After a review of the motions, oppositions, and the argument of counsel the Court is of the opinion that it would be confusing and overly prejudicial to allow the Defendant to attempt to explain the long and complicated procedural history of this case to the jury, and that most, if not all of this material is not relevant. For the same reasons, the Defendant's request for preclusion sanctions, adverse inferences, and jury instructions would be unduly prejudicial.

(Doc. 16-22, p. 28).

Judge Pipes further confirmed and clarified the Preclusion Order on the record

the following day, stating during a telephonic hearing:

It is my intention that this jury will not know about the prior trial. They will not know about the extended Rule 32 proceedings. They will not know about the proceedings on the motion for new trial and the motion to dismiss the indictment. But, certainly, the other materials, the things that you have gathered, the affidavits that you have gathered that we discussed at length several weeks ago can all be used for impeachment purposes, and I would expect that they would be.

. . .

I do think that it would cause an unnecessary amount of confusion and essentially a trial within a trial if we open this door. And I don't really - - once the door is opened, I'm afraid it becomes much harder to decide when and where to close it. . . . and I've come to the conclusion that I don't believe I can give an instruction to the jury that would be fair to both sides that would explain the situation.

(Doc. 16-32, pp. 39-40, 43).

Fearing that the Preclusion Order was fatal to him receiving a fair retrial, Martin petitioned the ASC for a writ of mandamus directing the trial court to allow the presentation of evidence and argument relating to his prior court proceedings and the State's misconduct. The ASC denied the petition. (Doc. 16-22, pp. 53-54).

Martin's case proceeded to trial for the second time in May 2019. (Doc. 16-32, p. 153). A jury again found Martin guilty of capital murder for Hammoleketh's death. (Doc. 16-23, pp. 16-19). This time he was sentenced to life imprisonment without the possibility of parole. (Id.) Martin appealed.

On June 26, 2020, the ACCA issued an unpublished memorandum opinion affirming Martin's conviction and sentence. (Doc. 16-49). Martin's application for rehearing was denied. (Doc. 16-51). On October 23, 2020, the ASC denied Martin's petition for writ of certiorari and issued a certificate of judgment. (Doc. 16-53). This time Martin did not file a postconviction Rule 32 petition. Instead, on October 21, 2021, Martin filed the timely federal habeas petition currently before this Court.[3] (Doc. 1).

## II. ANALYSIS

Martin presents three claims in his petition. The first two claims relate to the Preclusion Order, which Martin argues violated his constitutional right to cross-examination under the Sixth Amendment (the "Confrontation Claim"), and his constitutional right to present a complete defense under the Sixth and Fourteenth Amendments (the "Complete Defense Claim"). More specifically, Martin contends the Preclusion Order wrongly kept him from presenting evidence, including through cross-examination of the State's witnesses, to show the State suppressed exculpatory evidence

---

[3] The State agrees Martin's habeas petition is timely. (Doc. 16, p. 5).

prior to his first trial and that the same suppression showed bias, undermined the investigation's credibility, affected the credibility of each of the law enforcement officer's testimony, and provided reasonable doubt in and of itself. Martin's third claim argues the capital conviction violated his Fourteenth Amendment right to due process because the evidence against him was insufficient to prove that Hammoleketh's murder was committed for pecuniary gain (the "Sufficiency Claim"). Because the undersigned concludes that Martin's Sufficiency Claim is unexhausted and procedurally defaulted, that claim is addressed first in this report and recommendation. Martin's Confrontation and Complete Defense Claims are addressed after.

### A. Martin's Sufficiency Claim is unexhausted and procedurally defaulted.

Martin's third and final claim for relief—the Sufficiency Claim—contends the evidence at Martin's second trial was insufficient to support the State's capital charge of murder for pecuniary gain, thereby violating his Fourteenth Amendment right to be convicted only upon proof beyond a reasonable doubt. (Doc. 1, p. 17). Both Martin and the State addressed this argument substantively in their briefs, apparently assuming the issue had been properly exhausted before the Alabama courts. The undersigned reaches a different conclusion.

Any federal claims presented to a district court in a habeas petition must first have been exhausted in the state court system. *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1128-29 (11th Cir. 2022). The principal of comity "requires that the claims the prisoner presents to the district court be the *same claims* the prisoner exhausted in the state courts." *Id*. at 1129 (emphasis in original). If they are not the same—both in terms of their legal theory and the facts on which they rest—the federal court will treat the claim as

unexhausted. *Id.* (citing *Henderson v. Campbell*, 353 F.3d 880, 898 n.25 (11th Cir. 2003);

*Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004)).

There is no doubt Martin took issue with the sufficiency of the "pecuniary motive"

evidence against him throughout his trial and appellate proceedings before the Alabama

courts. However, he never couched the issue as a *federal* issue until he came to this

Court with his habeas petition. To illustrate,

- <u>Pre-Verdict Motion for Judgment of Acquittal</u> – In support of his pre-verdict motion for judgment of acquittal pursuant to Alabama Rule of Criminal Procedure 20.2, Martin argued the State's evidence failed to show he killed Hammoleketh for life insurance proceeds, or even that life insurance policies were in place that were payable in excess of $210,000 in the event of Hammoleketh's death. (Doc. 16-22, p. 196). The motion never mentioned the Alabama Constitution, the United States Constitution, or any federal caselaw; it cited only to Alabama state caselaw regarding convictions based on circumstantial evidence. (Doc. 16-22, pp. 191-197).

- <u>Post-Verdict Motion for Judgment of Acquittal</u> – In support of his post-verdict motion for judgment of acquittal pursuant to Alabama Rule of Criminal Procedure 20.3, Martin again challenged the sufficiency of the State's "pecuniary motive" evidence against him. He again cited to Alabama caselaw regarding convictions based on circumstantial evidence and added some citations to Arizona and Florida state law, but he never even mentioned due process or made any reference to federal law. (Doc. 16-30, pp. 23-46).

- <u>Martin's Brief to the ACCA</u> – On direct appeal from his conviction, Martin reraised the issue of whether the State's "pecuniary motive" evidence was sufficient. (Doc. 16-46). There he framed the issue as "[w]hether a judgment of acquittal is warranted for the State's failure to … prove the capital charge's aggravating factor of 'pecuniary gain' beyond a reasonable doubt." (Doc. 16-46, pp. 9-10). Like he did at the trial level, Martin referenced only state law and never raised any issues of federal law concerning the sufficiency of the evidence of pecuniary motive. Martin's application for rehearing to the ACCA similarly focused on state law, not federal law. (Doc. 16-50, pp. 28-31).

- <u>Martin's Petition for Writ of Certiorari to the ASC</u> – Martin remained focused on the sufficiency issue in his petition for writ of certiorari to the ASC. (Doc. 16-52). In that filing, he phrased the issue as "whether the fact that the defendant was a beneficiary on his wife's insurance policy is sufficient to prove the aggravating capital factor of murder for pecuniary gain under Alabama Criminal Code § 13A-5-40(a)(7). (Doc. 16-52, p. 5). Still Martin never mentioned the United

States Constitution, due process, or federal law at all. Instead, he said the issue was "an issue of first impression in Alabama" that justified a writ of certiorari. (Doc. 16-52, p. 12).

These filings all suggest Martin viewed his Sufficiency Claim as strictly a state law issue, that is until he came to this Court in the current habeas proceeding. Martin's Sufficiency Claim today is simply not the same claim he pursued throughout the Alabama courts.

Of course, Martin did not have to "use magic words or talismanic phrases to present his federal claim to the [Alabama] courts." *See Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 457 (11th Cir. 2015). But it is not enough just that Martin has been through the Alabama courts; "[t]he crux of the exhaustion requirement is simply that the petitioner must have put the state court on notice that he intended to raise a *federal claim*." *Id*. (emphasis added).

Martin seems to have anticipated this issue would come up. He briefly noted in his habeas petition: "Mr. Martin raised this claim in the state courts, where the test is the same." (Doc. 1, p. 87). That is not enough. "[O]rdinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or brief (or similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004). The fact that the Alabama courts might have dug down into the state law cases Martin cited to perhaps discover a federal due process claim does not satisfy the exhaustion requirement. *Cf. McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005) (petitioner's claim was unexhausted where his brief focused on state law and made only two passing references to federal law); *Landers v. Warden,*

*Att'y Gen. of Ala.*, 776 F.3d 1288, 1296-97 (11th Cir. 2015) (petitioner's due process claim was unexhausted where he did not cite to the Constitution or even mention "due process" before the state courts). Here, Martin presented the Alabama courts exclusively with state law cases, and his substantive arguments all addressed Alabama law. This does not satisfy the exhaustion requirement.

This outcome is not changed by the State's failure to raise the issue. Under 28 U.S.C. § 2254(b)(3), "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." *See also McNair*, 416 F.3d at 1304. The State has not expressly waived the exhaustion requirement and, indeed, robustly pursued it in defense of Martin's other habeas claims, an issue the undersigned addresses later in this report and recommendation.

Because Martin has not given the Alabama courts the opportunity to consider his Sufficiency Claim under federal law, it is unexhausted. And because Martin would now be time-barred from raising this claim before the Alabama courts in a postconviction collateral proceeding, the claim is also procedurally defaulted. See Ala. R. Crim. P. 32.2(c) (setting a one-year limitations period after a certificate of judgment is entered to file a Rule 32 proceeding); *Kuenzel v. State*, 204 So. 3d 910, 917 (Ala. Crim. App. 2015) (pendency of federal habeas proceeding did not constitute an extraordinary circumstance warranting equitable tolling).

When a claim is procedurally defaulted, a federal court may only entertain it if the prisoner establishes one of two exceptions. *Green*, 28 F.4th at 1129. The first is the "cause and actual prejudice" exception. *Id.* (citing *Engle v. Isaac*, 456 U.S. 107, 129, 102

S. Ct. 1558, 1573, 71 L. Ed. 2d 783 (1982)). The second is the "actually innocent" exception, also known as the "fundamental miscarriage of justice exception," which is applicable only in the most extraordinary of circumstances. *Id*. (citing *Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S. Ct. 2639, 2646–49, 91 L. Ed. 2d 397 (1986); *Johnson v. Singletary*, 938 F.2d 1166, 1174–76 (11th Cir. 1991)).

Martin has made no argument for cause and prejudice, but he does insist he is innocent, which warrants analysis of whether he qualifies for the "miscarriage of justice" exception. (Doc. 1, pp. 88 n. 12). This exception is "exceedingly narrow in scope" and requires a petitioner to "show that it is more likely than not that no reasonable juror would have convicted him of the underlying offense." *Johnson v. Alabama*, 256 F.3d 1156, 1171 (11th Cir. 2001) (internal quotations omitted). To be credible, "a claim of actual innocence must be based on reliable evidence *not presented at trial*." *Id.* (quoting *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S. Ct. 1489, 140 L. Ed. 2d 728 (1998)) (emphasis added). Martin has not offered any new evidence to support his claim of innocence. Therefore, the "actual innocence" exception to procedural default does not apply to his case.

In conclusion, Martin's Sufficiency Claim is unexhausted and procedurally defaulted, and no exception saves his claim. The undersigned recommends the Court dismiss this claim with prejudice.

Dismissal of this single claim, however, does not impact this Court's analysis of Martin's other claims on the merits. As such, the undersigned proceeds now to Martin's Confrontation and Complete Defense Claims. *See Kelley*, 377 F.3d at 1344-45 (allowing

dismissal of a petitioner's unexhausted claims and consideration of the remaining claims on the merits).

**B. Martin is not entitled to habeas relief on his Confrontation and Complete Defense Claims.**

**i.   Standard of Review**

This Court's authority to issue habeas relief is limited by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Section 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

By its text, § 2254(d) applies to federal claims that have been "adjudicated on the merits." Federal claims that have not been adjudicated on the merits in state court are subject to a *de novo* review. *Cone v. Bell*, 556 U.S. 449, 472, 129 S. Ct. 1769, 173 L. Ed. 2d 701 (2009) (citations omitted).

Since § 2254(d)'s requirements are hard to satisfy, "it is important whether a federal claim was 'adjudicated on the merits in State court'." *Johnson v. Williams*, 568 U.S. 289, 292, 133 S. Ct. 1088, 185 L. Ed. 2d 105 (2014). Habeas courts are to presume a claim has been "adjudicated on the merits" if the claim was presented to the state court and that court denied relief based on the substance of the claim rather than on a

procedural or some other ground. *Harrington v. Richter*, 562 U.S. 86, 99, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). Nothing requires a state court to specifically explain *why* it is denying a petitioner's federal claim. Section 2254(d)'s deferential standard applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Id*. In the same vein, when a state court order addresses some but not all of a petitioner's claims, it can be presumed (subject to rebuttal) that the state court adjudicated the unaddressed federal claims on the merits. *Johnson*, 568 U.S. at 300. This presumption is rebuttable though "[w]hen the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Id*. at 303.

In the undersigned's view, the Alabama courts adjudicated Martin's Confrontation and Complete Defense Claims on the merits, and § 2254(d) applies to this Court's review of those claims. For starters, quite the opposite from Martin's Sufficiency Claim, there is no question Martin presented his Confrontation and Complete Defense Claims to the Alabama courts, and those claims were denied substantively and not on some procedural ground. *Harrington*, 562 U.S. at 99. At the trial level, Martin made his constitution-based arguments extensively to the trial court judge, including specifically in his motion seeking to "prevent improper exclusion of the State's *Brady* violations and other misconduct." (Doc. 16-8, pp. 176-201; Doc. 16-9, pp. 2-40). A significant portion of that motion was devoted to advancing Martin's constitutional rights—the same rights he has raised before this Court in his current habeas petition. Here are some of the arguments made in Martin's motion:

- "Critically, any effort by the State to prevent Mr. Martin from introducing evidence would deprive him of his chosen defense, which would again violate Mr. Martin's constitutional rights." (Doc. 16-8, p. 185).

- "…it is a core constitutional Sixth Amendment right that Mr. Martin must be able to confront and question the credibility of the witnesses against him, through meaningful and complete cross-examination." (Doc. 16-8, p. 186).

- "In particular, the U.S. Constitution guarantees criminal defendants due process rights to present a defense and confront adverse witnesses, which include '[t]he right to present relevant testimony.'" (Doc. 16-9, p. 4).

- "Mr. Martin has a Sixth Amendment constitutional right under the Confrontation Clause to meaningfully question the State's witnesses, and that right may not be improperly restricted." (Doc. 16-9, p. 11).

The transcript of oral argument on Martin's pretrial motion further demonstrates that the trial court was fully aware of and intended to adjudicate these issues on the merits.

Some of the arguments Martin's counsel made during that hearing included:

DEFENSE COUNSEL: It is centrally relevant to Mr. Martin's defense. The confrontation clause, which the Court has mentioned several times in the process of this hearing, of the Sixth Amendment has a guarantee of meaningful and complete cross-examination, which would not be possible without the jury knowing how we got here and why we got here over 20 years since the death of Mrs. Martin and 19 years since the first case was tried. (Doc. 16-31, p. 179).

…

DEFENSE COUNSEL: The State's restrictions on presentation of evidence by defense implicate significant constitutional protections afforded to criminal defendants and deprive him of his chosen defense as the Alabama Court of Criminal Appeals said in the <u>Adams v. State</u>. (Doc. 16-31, p. 183).

…

DEFENSE COUNSEL: The Sixth Amendment, right of confrontation requires that Mr. Martin be able to confront and question the credibility of the adverse witnesses through meaningful and complete questioning and cross-examination. <u>Pennsylvania v. Ritchie</u>, a United States Supreme Court opinion, says, quote, the right to cross-examine includes the opportunity to show that a witness is biased or that the testimony is exaggerated or unbelievable. The right to confront one's accuser is satisfied if defense counsel receives a wide latitude at trial to question witnesses.

…

DEFENSE COUNSEL: Restrictions – and this is the United States Supreme Court in <u>Lucas</u>. Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence may not be arbitrary or disproportioned for the purposes they are designed to serve. (Doc. 16-32, p. 2).

…

DEFENSE COUNSEL: The jailhouse tape is gone. The gas can is gone. And the Sixth Amendment right to meaningful confront and question and State's witnesses have been seriously impaired by the passage of time and the lack of evidence having been turned over. And, as I previously cited, cross-examination may not be restricted.

The Sixth Amendment confrontation right in <u>Davis v. Alaska</u>, another US Supreme Court case, includes the right to cross-examination revealing possible biases, prejudice, or ulterior motives as they may directly relate to the issues in the case at hand. And they clearly relate to the issues at hand in this case. (Doc. 16-32, p. 3).

…

DEFENSE COUNSEL: The confrontation clause is not violated, said the Supreme Court in <u>Delaware v. Fensterer</u>, if the trial court did not limit the scope or nature of defense counsel's cross-examination in any way. Wrongdoing is admissible because it strongly bears on credibility said <u>Ritchie</u>. (Doc. 16-32, p. 4).

Despite these arguments, the trial court still issued the Preclusion Order that forms the basis for this habeas action, precluding Martin from bringing up his first trial, the Rule 32 proceedings, or the State's prior misconduct. (Doc. 16-22, p. 28).

In response, Martin's defense team filed a motion for clarification which led to a telephonic hearing on May 8, 2019. During that hearing, Martin's attorney reiterated his arguments that this evidence was admissible and necessary to protect Martin's constitutional rights. (Doc. 16-32, pp. 40-41). The trial judge responded:

THE COURT: Mr. Sharer, I understand your concerns. And, you know, I think you're making a very good argument on behalf of Mr. Martin. However,

I came to the conclusion after reviewing everything – and I did spend considerable time reviewing everything – that my decision was the right decision.

I do think that it would cause an unnecessary amount of confusion and essentially a trial within a trial if we open this door. And I don't really – once the door is opened, I'm afraid it becomes much harder to decide when and where to close it. (Doc. 16-32, p. 43).

Martin went on to raise these same issues in a pretrial petition for writ of mandamus to the ASC (Doc. 20-2, pp. 3-4, 25-32), which that court denied. (Doc. 16-22, pp. 53-53).

The trial court also addressed Martin's federal claims in its order denying his post-verdict motion for a new trial. (Doc. 16-30, pp. 118-121). Like he had before the trial, Martin once again argued the trial judge had committed prejudicial error by entering the Preclusion Order. The trial court ruled:

Prior to trial, the Court examined the issue of whether to allow the Defense to present evidence of the State's prior *Brady* violations, acts of misconduct, and the long and tangled procedural history of this prosecution. Multiple briefs, replies, etc. were filed on this issue, and on the accompanying request of the Defendant for adverse inference instructions. Oral argument was held on April 18, 2019. This Court entered its Order on May 7, 2019 denying this requested relief (document 506), The Court stands by its previous Order. Most, if not all of the evidence the Defense sought to present is not relevant to the issue of the Defendant's guilt, Instead, it is relevant to the State's prior violations, which were indeed egregious. However, it would have been unfairly prejudicial to the State, and it would have been confusing to the jury, to put the state on trial for its past transgressions, and to allow the Defendant to attempt to explain the long and complicated procedural history of this prosecution. A trial on the merits, without discussion of the eighteen-year history of appeals, multiple petitions for writs of mandamus, Rule 32 proceedings, Motion for New Trial, and Motion to Dismiss the Indictment, was the best way to insure both that both parties received a fair trial.

(Doc. 16-30, pp. 118-121).

Unsuccessful at the trial level, Martin continued to advocate for these constitutional rights in the Alabama appellate courts (Doc. 16-46, pp. 60-73; Doc. 16-52, pp. 18-19), which resulted in the ACCA ruling as follows:

Martin argues that the circuit court erred in excluding evidence of the State's misconduct of suppressing evidence in the case. Martin contends that this evidence was "highly relevant" to his defense, was necessary to a meaningful cross-examination of witnesses, was "highly relevant" to the inference that the State is conscious of its weak case, and was necessary to combat jury speculation about the time gap between Hammoleketh's death and the trial. (Martin's brief, at p. 54.) Martin claims that the circuit court compounded its error by refusing to give an adverse-inference instruction.

. . .

The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court's determination on that question will not be reversed except upon a clear showing of abuse of discretion." Ex parte Loggins, 771 So. 2d 1093, 1103 (Ala. 2000). Rule 402, Ala. R. Evid., states that "[e]vidence which is not relevant is not admissible. Further, even if relevant, evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403, Ala. R. Evid.

Martin has not presented any pertinent authority that evidence of prior suppression of evidence by the State before a trial is admissible in a <u>new</u> trial. The authority to which Martin cites and the arguments he makes as to why he should be allowed to make the jury aware of prior misconduct involve situations in which the State has suppressed or lost evidence prior to or during a trial. Certain sanctions and remedies would be appropriate in those circumstances. In this case Martin was aware, prior to the instant trial, of the evidence that had been omitted in the first trial. This evidence was presented during the new trial, and Williams, Taylor, and Broach all testified. The circuit court allowed Martin to use prior statements contained in affidavits and previous testimony of witnesses during trial. Although Martin claims that the gas can has been lost or destroyed, whether parts of a gas can were ever recovered from the vehicle was disputed. This contradictory evidence was presented at trial. Accordingly, Martin was not entitled to an adverse instruction.

Martin has not shown that evidence of prior misconduct was necessary to his defense at trial or how he was substantially prejudiced by its omission. This Court agrees with the circuit court that evidence of prior misconduct or

suppression by the State is irrelevant, prejudicial, and would be confusing to the jury. See Rules 402 and 403, Ala. R. Evid. Therefore, the circuit court did not abuse its discretion in excluding the evidence.

Additionally, Martin's claim regarding the circuit court's failure to give an adverse-inference instruction is likewise without merit. A trial court has broad discretion in formulating its jury instructions. See Albarran v. State, 96 So. 3d 131, 186 (Ala. Crim. App. 2011). Here, given the circuit court's excluding the evidence at issue, there was no evidence that would support the giving of an adverse-inference instruction. Thus, the circuit court did not abuse its discretion in denying Martin's request for an adverse-inference instruction.

(Doc. 16-49, pp. 15-17) (footnote omitted) (the 2020 ACCA Opinion). The ASC summarily affirmed this ruling. (Doc. 16-53).

The 2020 ACCA Opinion demonstrates that Martin's constitutional claims were denied on their substance and not on any procedural or other ground. (Doc. 16-49; Doc. 16-53). As such, there is a rebuttable presumption under *Richter* and *Johnson* that Martin's Confrontation and Complete Defense Claims were adjudicated on the merits. *Johnson*, 568 U.S. at 300. Martin perhaps could rebut this presumption with evidence that "leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court." *Johnson*, 568 U.S. at 303. He has not done so.

Martin thinks the issue turns on the fact that the 2020 ACCA Opinion discussed state evidentiary law rather than federal constitutional law. (Doc. 1, p. 46).[4] But this fact alone is not sufficient to overcome the *Richter* presumption. While the undersigned agrees with Martin that the ACCA did not expressly state it was deciding Martin's claims

---

[4] The State does not take a clear position on the issue in its brief, but the State's all-purpose reference to Section 2254(d) suggests it thinks Section 2254(d) review applies to these claims. (Doc. 16, pp. 5-6). There is a notable contradiction in the State's position. On one hand, the State suggests § 2254(d) applies, which means that Martin's claims *were* adjudicated on the merits. On the other hand though, the State argues that Martin's claims are procedurally defaulted because they were never raised before the Alabama courts. (Doc. 16, pp. 15-16). Both cannot be true.

under the Sixth or Fourteenth Amendments, this is not dispositive. The presumption under *Richter* and *Johnson* applies even when the state court offers no explanation for its denial of a petitioner's federal claims. Martin must do more than point to the ACCA's silence to overcome the presumption.

Two more points are worth noting on this issue. First, although it did not directly reference any federal law, the ACCA *did* point out that Martin was allowed to confront State witnesses using their prior inconsistent statements from affidavits and prior inconsistent testimony from the first trial, which speaks to Martin's opportunity to cross-examine the State's witnesses and present his theory of defense. (Doc. 16-49, p. 17). Even more, the ACCA took note of the trial court's refusal to declare certain witnesses unavailable out of "concern[] about Martin's right to confrontation." (Doc. 16-49, p. 17 n. 2). These parts of the ACCA opinion further support the undersigned's conclusion that the ACCA intended to—and did—adjudicate Martin's constitutional claims on the merits. *See Childers v. Floyd*, 736 F.3d 1331 (11th Cir. 2013) (a state appellate court had not "inadvertently overlooked" a habeas petitioner's Confrontation Clause claim when the court's analysis reached the "essence" of the right of confrontation). Second, it is significant that, after the ACCA rendered its decision on direct appeal, Martin petitioned that court for rehearing but devoted only a small fraction of his brief to the Preclusion Order issue. And, although he recited some federal caselaw, Martin never directly said the ACCA had overlooked his federal constitutional issues. (Doc. 16-50, pp. 31-33). Taking these things into consideration, and in light of the well-developed record showing the Alabama courts were presented with Martin's constitutional claims repeatedly throughout his proceedings and denied those claims substantively and not procedurally,

the undersigned concludes Martin's Confrontation and Complete Defense Claims were adjudicated on the merits. Section 2254(d) governs Martin's claims.

Next it is helpful to clarify precisely what § 2254(d) requires. Section 2254(d) is essentially a bar to relitigation; it forecloses relief unless the last state-court adjudication on the merits—here the 2020 ACCA Opinion—involved an unreasonable application of federal law or was based on an unreasonable determination of fact. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1191, 200 L. Ed. 2d 530 (2018); *Sears v. Warden GDCP*, 73 F.4th 1269 (11th Cir. July 19, 2023) (quoting *Greene v. Fisher*, 565 U.S. 34, 40, 132 S. Ct. 38, 181 L. Ed. 2d 336 (2011)). Because Martin's Confrontation and Complete Defense Claims allege the Preclusion Order violated federal law—specifically the Sixth and Fourteenth Amendments and established federal law interpreting them—subpart (d)(1) (the "contrary to" or "unreasonable application" clause) is at issue.

Under § 2254(d)(1), habeas relief is warranted if Martin's constitutional claims are meritorious and resulted in a decision that was "contrary to" or "involved an unreasonable application of" federal law. A state court's decision is "contrary to" clearly established law if the state court reached a conclusion opposite to one reached by the Supreme Court on the same question of law, or if the state court arrived at a different result from the Supreme Court on "materially indistinguishable" facts. *Sears*, 73 F.4th at 1279 (citing *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). A state court's decision is an "unreasonable application" of established federal law if the state court identifies the correct governing legal rule from Supreme Court caselaw but unreasonably applies it to the facts of the case. *Id*. (citation omitted).

As explained below, the undersigned cannot say the Alabama courts' denial of Martin's Confrontation and Complete Defense Claims was contrary to or an unreasonable application of established federal law. But before analyzing those claims, the undersigned first dispenses with two preliminary issues raised by the State: (1) whether Martin's Confrontation and Complete Defense Claims are procedurally defaulted and (2) whether these claims are distinctly state law issues that fall outside the scope of federal habeas review. For the reasons explained below, the undersigned disagrees with the State on both issues.

### ii. Contrary to the State's assertions, Martin's Confrontation and Complete Defense Claims are not procedurally defaulted.

The State says Martin's Confrontation and Complete Defense Claims are procedurally defaulted and should be summarily dismissed. As the State sees it, Martin failed to raise these claims on direct appeal, and "[n]owhere within his petition for writ of certiorari did Martin argue, as he does here, that the exclusion of this 'evidence' violated the Confrontation Clause or denied him the right to present a complete defense…" (Doc. 16, p. 15). This argument cannot be reconciled with the record.

As analyzed above in Section II.B.i., Martin raised his Confrontation and Complete Defense Claims extensively at the trial level, including specifically in his motion seeking to "prevent improper exclusion of the State's *Brady* violations and other misconduct." (Doc. 16-8, pp. 176-201; Doc. 16-9, pp. 2-40). He raised them again in a pretrial petition for writ of mandamus to the ASC (Doc. 20-2, pp. 3-4, 25-32) and in a post-verdict motion for new trial back before the trial judge. (Doc. 16-30, pp. 118-121). He pursued them on appeal too, both before the ACCA and the ASC. (Doc. 16-46, pp. 60-73; Doc. 16-50, pp. 31-33; Doc. 16-52, pp. 18-19).

"[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues." *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1352 (11th Cir. 2012). The record easily confirms Martin brought his Confrontation and Complete Defense Claims to all levels of the Alabama courts, including the Alabama Supreme Court, and they are exhausted and ripe for review. (Doc. 16-46 at 4, 61, 63-65; Doc. 16-50 at 6, 21-22; Doc. 16-52 at 2, 18-19).

### iii. Contrary to the State's assertions, Martin's Confrontation and Complete Defense Claims are cognizable federal claims and not simply state law evidentiary issues.

The State also contends Martin's Confrontation and Complete Defense Claims are not proper federal constitutional claims, but rather are simply state law evidentiary challenges not subject to federal habeas review. (Doc. 16, pp. 12-15). As the State sees it:

> Although Martin attempts to couch [Claim I and II] as [] addressing confrontation and the right to present a complete defense, the issue presented here is the admission or exclusion of evidence—specifically, the procedural history from Martin's original trial, conviction, and ultimate reversal. Such a challenge does not present a claim cognizable under federal habeas.

(Doc. 16, p. 12). The undersigned sees Martin's claims differently.

The Alabama courts' handling of the Preclusion Order is not insulated from habeas review simply because the Preclusion Order rests in an evidentiary ruling. Indeed, no state order may be issued that violates a defendant's federal constitutional rights. U.S. Const. Art. VI, Para. 2 (The Supremacy Clause provides that "[t]his Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."); *United States*

*v. Lankford*, 955 F.2d 1545, 1549 (11th Cir. 1992) (acknowledging that a court's discretion in ruling on the admissibility of evidence is subject to constitutional protections). Thus, the undersigned turns to the substance of Martin's Confrontation and Complete Defense Claims.

iv. **The Alabama courts did not violate Martin's Sixth Amendment right to confront State witnesses or his Sixth and Fourteenth Amendment right to present a complete defense.**

Martin's Confrontation Claim alleges the Preclusion Order violated his right under the Sixth Amendment of the United States Constitution to confront State witnesses about their evidentiary suppression and expose their bias. Relatedly, Martin's Complete Defense Claim argues the Preclusion Order violated his right under the Sixth and Fourteenth Amendments to present a complete defense. The State did not respond to the substance of these claims, instead arguing the claims are not federally cognizable and/or are procedurally defaulted, arguments the undersigned already overruled. For the reasons set forth below, the undersigned recommends that both claims for habeas relief be denied.

a) **The Alabama courts' denial of Martin's Confrontation Claim was not contrary to or an unreasonable application of federal law.**

To decide whether Martin is entitled to relief on his Confrontation Claim, the Court must decide whether the Alabama courts' denial of that claim resulted in a decision that was contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The "clearly established Federal law" relevant to Martin's Confrontation Claim comes from the text of the Sixth Amendment's Confrontation Clause and United States Supreme Court caselaw interpreting that clause.

Pursuant to the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The "central concern" of the Confrontation Clause is to "ensure the reliability of evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*, 497 U.S. 836, 845, 110 S. Ct. 3157, 111 L. Ed. 2d 666 (1990).

Confrontation Clause cases usually fall within one of two broad categories: (1) cases involving the admission of out-of-court statements and (2) cases involving restrictions imposed by law or by the trial court on the scope of cross-examination. *Delaware v. Fensterer*, 474 U.S. 15, 18, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985). Martin's claim falls in the second category. He claims the Preclusion Order improperly limited the scope of his cross-examination of the State's witnesses by prohibiting questions about "the State's evidentiary suppression and how it foreclosed a timely and proper investigation of the leads that [the suppressed evidence] suggested." (Doc. 1, p. 51).

In Confrontation Clause cases like Martin's which involve limited cross-examination, two important themes emerge. For the criminal defendant, "'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986) (quoting *Fensterer*, 474 U.S. at 20). For the trial court, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or

only marginally relevant." *Id*. Said differently, trial judges must strike a balance between allowing a criminal defendant a meaningful opportunity to cross-examine witnesses against him, while also managing the trial in a way that avoids prejudice, confusion, or similar problematic issues.

A criminal defendant can show a Confrontation Clause violation by demonstrating he was "prohibited from engaging in otherwise appropriate cross-examination" such that "[a] reasonable jury might have received a significantly different impression of [a witness's] credibility had [defense counsel] been permitted to pursue his proposed line of cross-examination." *Id.* at 680. "Not every limitation on cross-examination violates the Confrontation Clause. '[T]he Sixth amendment does not require unlimited inquiry into the potential bias of a witness. <u>As long as sufficient information is elicited from the witness from which the jury can adequately assess possible motive or bias, the Sixth Amendment is satisfied</u>." *De Lisi v. Crosby*, 402 F.3d 1294, 1301 (11th Cir. 2005) (citing *Lankford*, 955 F.2d at 1549 n. 10) (emphasis added). With this standard in mind, the undersigned examines whether the Alabama courts violated "clearly established Federal law" by upholding the Preclusion Order.

The undersigned begins with the trial court record, which provides important insight into on how the trial judge viewed the Preclusion Order and its intended impact on the parties' efforts to introduce (or exclude) any reference to Martin's first trial, the subsequent Rule 32 proceedings, or any prior court rulings about evidentiary suppression or witness credibility. First, after issuing the Preclusion Order, the trial judge made clear that his ruling was not intended to limit the defense's ability to delve into the State's inadequate

or defective investigation or the potential for bias or motive on the part of the State's witnesses:

> My ruling is not intended to impede the defense's ability to introduce evidence, cross-examination of witnesses, or make arguments at trial regarding the State's alleged inadequate and defective investigation, including its failure to pursue leads, alternate theories, and alternative suspects, or the State's alleged bias conduct in its investigation, including its premature and unsupported facts – I'm sorry – focus on the defendant from the beginning … Now, you can certainly get into that, and I would expect that you would. However, it will not be through any sort of introduction of evidence, cross-examination, or argument concerning any of the prior procedural history of this trial.

(Doc. 16-32, pp. 38-39).

As the trial date approached, the trial judge remained focused on permitting as much cross-examination as possible while avoiding the issues of confusion, prejudice, and irrelevance that were raised in the Preclusion Order. For instance, the trial judge and the parties engaged in one of several pretrial discussions about what evidence of *Brady* violations might be introduced, and the following exchange occurred:

> DEFENSE COUNSEL: Well, Your Honor, they're going to contend, I'm quite sure, that the man that Mr. Taylor saw in a trooper car at the corner of Larue Steiner Road and Highway 90 was Mr. Martin. And they contended that at the time of trial knowing full well that Mr. Taylor had identified an entirely different officer who didn't look anything like Mr. Martin.

> If they're going to do that again, are we not permitted to demonstrate, first of all, that here is the photo array and here are Mr. Taylor's comments or statements clearly pointing out that it wasn't Mr. Martin and indicating that we only found out about this years later?

> One of the reasons why we're here 24 years afterwards is because that and a lot of other information was never provided.

> THE COURT: Mr. Sharer, you keep going back to what was not provided. And we cannot -- I have ruled on that and I'm not going to change that ruling.

> However, if in the intervening years Mr. Taylor, the witness, backtracks and if the State wants to, you know, pursue this theory, **I intend to give the**

**defense wide latitude to show that he made a different identification of a different person. That was a Brady violation. That did happen. And so I intend to give the defense wide latitude to pursue that with that witness.**

(Doc. 16-32, pp. 120-121) (emphasis added). The trial judge and the parties also had extended discussions about using State witnesses' prior statements and testimony to impeach them where appropriate. (Doc. 16-32, pp. 121-125). Martin even successively prevented the State from reading one deceased law enforcement witness's prior testimony into the record because he was not effectively cross-examined at the first trial due to the *Brady* violations. (Doc. 16-32, p. 131). All of these interactions show the trial judge was intent on allowing the defense to cross-examine and impeach the State's witnesses, just without specifically mentioning any prior court proceedings or court rulings as to evidentiary suppression or witness credibility.

In keeping with this pretrial design, the trial judge gave Martin's counsel wide latitude at trial to examine law enforcement witnesses—both the State's witnesses and law enforcement witnesses the defense itself called—with questions designed to show they were biased against Martin from the start, that they had potentially fabricated evidence against Martin, and that their testimonies were unreliable due to past inconsistent statements and the passage of time. As one example, when Martin's counsel cross-examined Alabama Bureau of Investigations (ABI) Officer Robert Scheer, he asked questions insinuating Officer Scheer considered Martin to be untrustworthy and was biased against him from the start, but had, quite differently, blindly accepted Grayling Williams's story about where he was the night of Hammoleketh's death:

> Q. Grayling Williams was home talking on the phone to his fiancée. Is that what you said?

> A.   Yes. That's what -- what he said.
>
> Q.   That's what Grayling Williams told you; right?
>
> A.   Yes.
>
> Q.   George Martin told you he was home with a bad cold, fell asleep. Grayling Williams is telling the truth and George Martin is lying. Is that what you said?
>
> A.   I didn't say George Martin was lying.

(Doc. 16-40, p. 135). Defense counsel also *accused Officer Scheer of lying* to Martin about his fingerprints being found at the scene (Doc. 16-40, p. 136) ("But you lied to him. You told him there were fingerprints on a match cover and you knew that was not true?");

*suggested that Officer Scheer and the Mobile Police Department had improperly focused on Martin* after they received Taylor's tip about a state trooper being in the area (Doc. 16-40, p. 137) ("…the Police Department and you seized on the likelihood, in your mind, that that was George Martin; correct?"); and *alluded to law enforcement having improperly characterized Taylor's eyewitness account* to mean that Martin was in the area where the car fire occurred (Doc. 16-30, p. 139) ("…the Mobile Police Department and you were using that citation or that sighting by Mr. Taylor as evidence that it was Mr. Martin that was there and he was somehow or other plotting out when he was going to do something terrible. Isn't that correct?"). In other words, the trial court permitted defense counsel significant leeway to cross-examine Officer Scheer to show law enforcement's bias against Martin, contrary to what Martin now suggests.

Martin's counsel was also allowed to broadly cross-examine law enforcement witnesses with questions to support Martin's theory that law enforcement had fabricated records related to their investigation and that their testimonies were unreliable due to the significant passage of time (which the jury had already been told was not Martin's fault).[5] Defense counsel's cross-examination of Mobile Police Department (MPD) Officer Johnny Ladner illustrates this point. During cross-examination, defense counsel forcefully questioned Officer Ladner about his failure to take any notes or prepare a report when he responded to the scene of Hammoleketh's death in October 1995:

> Q.    Now, when you did what you say you did on the evening of 1995, you made no notes.
>
> A.    That's correct. Yes, sir.
>
> Q.    And you made no report?
>
> A.    That's correct. Yes, sir.
>
> …
>
> Q.    And it was a year and a half or later, closer to two years, that Tommy Calhoun, Major Calhoun – Do you know who he is?
>
> A.    Yes, sir.
>
> Q.    -- and did he ask where is your report, where are your notes?

---

[5] Before the trial began, the trial judge instructed the jury venire:

> Ladies and gentlemen, through no fault of his own, Mr. Martin is on trial today almost 24 years after the death of his wife. Some of you may be wondering why, why the long time period. I can only tell you that this delay in time was not caused by Mr. Martin in any way, shape, or form. I repeat nothing he has done has caused this delay in time for this trial.
>
> Does everyone agree that they will not speculate as to why this trial is taking place now 24 years after the death of Mrs. Martin? Does everyone agree that you'll follow that instruction, that you'll not speculate as to why this trial is taking place now?

(Doc. 16-34, p. 22). No one on the panel indicated they would hold the passage of time against Martin, and it can be presumed the jury followed these instructions in evaluating the witnesses' testimonies. *See Weeks v. Angelone*, 528 U.S. 225, 234, 120 S. Ct. 727, 145 L. Ed. 2d 727 (2000) (internal citation omitted) ("A jury is presumed to follow its instructions.")

A.     He did, yes, sir.

Q.     And what did you tell him? Did you make up a story? Or did you tell
       him you didn't do them?

A.     I did not make up a story, sir.

(Doc. 16-38, pp. 170-71); (Doc. 16-38, p. 181) ("And you're telling us that you prepared

that from memory and nobody told you what, if anything, to put in there?"). For several

pages of transcript, defense counsel confronted Officer Ladner with questions about why

he had not prepared a report or taken notes and then attempted two years after the

incident to recreate the report from memory, undoubtedly making the case to the jury that

Officer Ladner's report had been unreliable and possibly even fabricated. (Doc. 16-38, pp.

170-176). Similar questioning was done of ABI Officer Scheer (Doc. 16-40, p. 147) ("So

we're talking 23 years ago. You don't have a note. You don't have a memo. You don't

have a record. And you specifically sit there and tell us that you remember that there was

a source that you had that you explored that told you that [Martin] had an affair with

Regina Creer? You remember that from 23 years ago?") and of MPD Homicide

Investigator Donald Pears (Doc. 16-43, p. 125) ("You really remember all the things Mr.

Arrington is telling you, you remember this, you remember that? After 23 years, do you

remember all those things?").

Finally, Martin's counsel freely tested law enforcement witnesses' reliability using

their own prior inconsistent sworn statements. As one example, to advance his theory

that law enforcement had tampered with evidence, Martin's counsel impeached Fire

Investigator Larry Hansen with his prior inconsistent testimony about whether some

magazine-type evidence found at the scene was a phonebook or a *Galls* catalog (a

catalog that caters to law enforcement officers, which Martin contends law enforcement planted to support their wrongful case against him). (Doc. 16-39, pp. 137-141). Martin's counsel similarly impeached several law enforcement witnesses about whether they had seen remnants of a gas can at the scene of the fire, which advanced Martin's theory that officers *had* seen a gas can but subsequently changed their stories to strengthen their case against him. (Doc. 16-43, pp. 33-35, 39-42) (MPD Officer Charles Bailey was impeached with inconsistent sworn statements about whether he had seen the remains of a gas can at the crime scene, which Bailey attributed to being misled by an investigator that worked for Martin's defense team); (Doc. 16-43, pp. 89-90) (Martin's counsel impeached MPD Homicide Investigator Donald Pears with prior inconsistent testimony about having found remnants of a gas can at the scene); (Doc. 16-43, pp. 134-41) (Martin's counsel impeached MPD Chief of Detectives Major Wilbur Williams with inconsistent prior sworn statements about whether a gas can had been found at the scene, which Williams also blamed on confusion caused by defense counsel's investigator).

To the undersigned, this record demonstrates that Martin was given a constitutionally sufficient "opportunity for effective cross-examination" albeit maybe not as probing as he might have wished. *See Van Arsdall*, 475 U.S. at 679 ("the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish") (emphasis in original). With this opportunity, Martin elicited sufficient information from these law enforcement witnesses that the jury could assess their potential for bias and motive. Therefore, the Alabama courts' denial of his claims under the Confrontation

Clause were neither contrary to, nor an unreasonable application of, established federal law.

Indeed, there is a "stark contrast" between the limitation in the Preclusion Order and the "categorical limitations" condemned by the Eleventh Circuit and the Supreme Court in other cases. *De Lisi*, 402 F.3d at 1302-03 (citing *Van Arsdall*, 475 U.S. at 679 (where the trial court prohibited *all* inquiry into the possibility that the government's star witness was potentially based as a result of the State's dismissal of a pending criminal charge); *Lankford*, 955 F.2d at 1548 (where the trial judge did not permit any evidence that children of the government's star witness were subject to pending prosecution that might be dropped if the witness testified favorably); *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1366-67 (11th Cir. 1994) (where the trial court excluded all evidence necessary for several credibility challenges against the key government witness). But that is not what happened in Martin's case. The trial court allowed Martin to conduct a broad cross-examination of the law enforcement witnesses in his case, and he elicited testimony from them that showed the jury how the State's investigation into Hammoleketh's death was potentially biased and ineffective, and that law enforcement witnesses' testimony was potentially unreliable. In other words, Martin was permitted significant cross-examination of the State's witnesses; he just wasn't allowed to delve as deeply as he desired.

The undersigned finds the caselaw on which Martin relies—*United States v. Lankford*, 955 F.2d at 1545 (11th Cir. 1992), *McKinzy v. Wainwright*, 719 F.2d 1525, 1529 (11th Cir. 1983), and *Sec'y, Fla. Dep't of Corr. v. Baker*, 406 F. App'x 416, 424-25 (11th Cir. 2010)—distinguishable. Martin says these cases resulted in Sixth Amendment

violations even though those trial courts had imposed "lesser restrictions on a defendant's confrontation rights than those imposed by the blanket Preclusion Order." (Doc. 1, p. 54). The undersigned reads them differently. First, both *Lankford* and *Baker* were decided on direct appeal where the legal standard is not as rigorous as the standard applicable to this habeas proceeding. And *McKinzy*, although it was a habeas case, did not result in a finding of a Sixth Amendment violation, but rather led to the case being remanded for further factual development on whether the defendant's right to confrontation had been violated. Even more persuasive though, *Lankford*, *Baker*, and *McKinzy* are distinguishable because they all involved court-imposed prohibitions on cross-examination of the prosecutions' "star" witnesses, and in each case, without the ability to cross-examine those witnesses, there was no other way for the defendants to show those witnesses had motive to testify favorably for the government. Martin's case is different. Sure, the law enforcement witnesses testifying at Martin's trial were key to the State's case against him, but unlike the defendants in *Lankford*, *Baker*, and *McKinzy*, Martin was not prohibited from showing these "star" witnesses had a motive to testify in favor of the government. As demonstrated above, Martin was given plenty of opportunity—and certainly did—confront the law enforcement witnesses about their potential for bias or motive. Indeed, even without this rigorous cross-examination, these witnesses' sheer status as law enforcement officers made clear to the jury that they could be, and likely were, biased in favor of the State. *See United States v. Benavides*, 407 F. App'x 782, 791 (11th Cir. Apr. 24, 2012) (unpublished) (the fact that a law enforcement witness took part in the defendant's investigation "likely made it apparent to the jury that he played for the

same team as the Government"). *Lankford*, *Baker*, and *McKinzy* do not change the undersigned's opinion that Martin's Confrontation Claim fails.

Martin also cites to *Alvarez v. Ercole*, 763 F.3d 223, 234 (2d Cir. 2014) as persuasive authority in support of his claims. (Doc. 1, pp. 54-56). *Alvarez* is distinguishable from Martin's case too. In *Alvarez*, the defendant's trial strategy was to show the police department's investigation had been incomplete in ways that created reasonable doubt about the defendant's guilt. To support this theory, the defendant sought to cross-examine the lead detective to show that certain leads had not been investigated. The trial court prohibited the questioning because it would lead to the introduction of impermissible hearsay, and alternatively that it was inadmissible under a different state law evidentiary rule. *Id*. at 228. The Second Circuit Court of Appeals concluded that, in do so, the trial court violated Alvarez's rights under the Confrontation Clause because, "by cutting off this line of questioning," the court's evidentiary rulings "effectively denied Alvarez the opportunity to develop his only defense" and "left Alvarez without any support for his theory of the case." *Id*. at pp. 225, 232.

Unlike in *Alvarez*, Martin *was* permitted to question law enforcement officials extensively about their efforts (or lack thereof) to investigate certain leads. As one example, when cross-examining ABI Officer Scheer, whom Martin has called one of the State's "key witnesses" (Doc. 1, p. 52), Martin's counsel worked without interference from the trial court to prove the State's investigation into Grayling Williams as a potential suspect was abbreviated and ineffective:

Q:     What you did is you checked his phone records, who he had phoned,
       Mr. Williams, and who had phoned him; right?

A:     Yes.

Q:     Did you do that?

A:     Yes.

Q:     And the other thing you did was when you called him to come in, you put surveillance on him from the time he left from where he was coming from to the time he got to headquarters and then surveilled him again when he left and went back to where he went, maybe to his home; correct?

A:     Correct.

Q:     And that was the end of it. Grayling Williams had nothing to do with it.

A:     That, along with his statement.

A:     His statement, your few hours surveillance, and checking who he called and who he didn't call. That was it; right?

A:     Yes.

(Doc. 16-40, p. 140).

Defense counsel also delved unimpeded into questions designed to show that law enforcement did not fully investigate the anonymous tip phone call they received implicating Grayling Williams:

Q:     When that anonymous call came into that cadet, who is now Major Jackson, it could have been traced, couldn't it?

A:     Possibly could have been.

Q:     And wouldn't tracing that phone call to whoever made it make more significance than taking his statement that he was home calling his fiancée?

A:     Yes. That makes a lot of sense. And I'm not -- don't know whether that was done or not. The call --

Q:     Well, I'm assuming it wasn't done because there's no record that it was.

A: Well, there may -- it -- there may have been an attempt made by the Mobile Police Department.

…

Q: You have no evidence whatsoever that that anonymous phone call was traced, do you?

A: No, I do not.

Q: And it could have been traced had somebody thought to do it?

A: Yes.

Q: And had it been traced, you had a very good chance of finding out who had placed that call?

A: Yes.

Q: And instead of doing that, you took -- you took Mr. Williams' statement and that was it.

(Doc. 16-40, pp. 140-142).

Martin's counsel also elicited testimony through Officer Scheer that supported Martin's theory that law enforcement failed to adequately investigate the potential lead provided by Norma Broach:

Q: So during that time frame, the two or three, four months, whatever it was, did you hear that Mrs. Broach had called Crime Stoppers about what he had seen twice? Did you hear about that?

A: No.

Q: Did you hear that she talked to the Mobile Police Department twice in that time frame?

A: No, I did not.

Q: Didn't hear about that at all?

A: No, I didn't. I didn't do everything in this investigation.

Q: And nobody reported anything about Mrs. Broach?

| STATE'S COUNSEL: | Your Honor, I'm going to object to this line. It's been asked and answered. |
|---|---|
| DEFENSE COUNSEL: | Nothing further, Your Honor. |

(Doc. 16-40, pp. 160-61). Martin's counsel similarly questioned Officer Scheer about his lack of documentation regarding an extramarital affair Martin had with another woman (Doc. 16-40, p. 147); about law enforcement's failure to investigate a supposed criminal element at Hammoleketh's church (Doc. 16-40, p. 149); and about a largely undocumented interrogation of Martin (Doc. 16-40, p. 152). Other law enforcement witnesses were questioned about the supposedly flawed investigation too. (Doc. 16-39, pp. 185) (Martin's counsel asked Alabama State Trooper Everett Tolbert: "And it was during that ride to the trooper post that Mr. Martin told you that he was concerned that police officers were just standing around at the scene; correct?"); (Doc. 16-40, pp. 70-78) (questioning Officer Grayling Williams about how he had only been briefly questioned about Hammoleketh's death and that neither his home, his personal car, nor his patrol car had ever been searched); (Doc. 16-43, pp. 76-81) (questioning MPD Investigator Donald Pears about evidence being removed from the crime scene while the scene was supposed to be shut down and whether procedures were followed to document that evidence); (Doc. 16-43, p. 146) (questioning Major Wilbur Williams to show that, even though he was chief of detectives at the time of Hammoleketh's death, he had never heard of Norma Broach's eyewitness account or James Taylor's identification of Grayling Williams on the photo array). These exchanges between law enforcement witnesses and Martin's counsel at trial demonstrate that Martin, unlike the defendant in *Alvarez*, was permitted to pursue his theory that the State's investigation into Hammoleketh's death

was flawed and insufficient. *Alvarez* does not change the undersigned's view of Martin's claim.

In summation, the undersigned cannot conclude the Alabama courts' denial of Martin's Confrontation Claim was contrary to or an unreasonable application of established Federal law. The undersigned recommends Martin's Confrontation Claim be denied.

### b) <u>The Alabama courts' denial of Martin's Complete Defense Claim was not contrary to or an unreasonable application of federal law.</u>

Like Martin's Confrontation Claim, his Complete Defense Claim turns on whether the Alabama courts' rejection of that claim resulted in a decision that was contrary to, or an unreasonable application of, "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The "clearly established Federal law" relevant to Martin's Complete Defense Claim is the Sixth and Fourteenth Amendments of the United States Constitution and United States Supreme Court caselaw interpreting those constitutional provisions.

As Martin correctly points out, the Constitution "guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986). However, "the right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998) (citations omitted). The Supreme Court has said that a defendant's interest in presenting even relevant evidence may "bow to accommodate other legitimate interests in the criminal trial process." *Id*. (internal citations and quotations omitted).

The Supreme Court has instructed lower courts how to approach evidentiary rulings that potentially impede on a criminal defendant's constitutional rights:

> [S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

*Id*. at 308 (internal citations and quotations omitted). In other words, if an evidentiary ruling is not arbitrary or disproportionate, or if it does not infringe upon a weighty interest of the defendant, it does not violate a defendant's constitutional rights.

"Only rarely" has the Supreme Court held that a state law evidentiary ruling violated the right to present a complete defense. *See Nevada v. Jackson*, 569 U.S. 505, 509, 133 S. Ct. 1990, 1992, 186 L. Ed. 2d 62 (2013) (citing *Holmes v. South Carolina*, 547 U.S. 319, 331, 126 S. Ct. 1727, 1731, 164 L. Ed. 2d 503 (2006) (rule excluding evidence of third party guilt did not rationally serve any discernible purpose); *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (state *per se* evidentiary rule prohibiting the admission of hypnotically refreshed testimony was arbitrary and violated the criminal defendant's constitutional right to testify in her own defense); *Chambers v. Mississippi*, 410 U.S. 284, 302–303, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (state court's application of an antiquated "voucher rule" combined with its mechanistic application of the hearsay rule violated the defendant's due process rights); *Washington v. Texas*, 388 U.S. 14, 22, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (a state procedural rule precluding codefendants from being called as witnesses for each other was "absurd" and could not be rationally defended); *see also Crane*, 476 U.S. at 683 (state court's blanket exclusion

of evidence relating to the voluntariness of a defendant's confession violated his right to present a complete defense).

By contrast, the Supreme Court has agreed that many evidentiary rules *do not* run afoul of the Constitution, specifically including "well established rules of evidence [which] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury". *Holmes*, 547 U.S. at 326-27 (citing Fed. Rule Evid. 403; Uniform Rule of Evid. 45 (1953); ALI, Model Code of Evidence Rule 303 (1942); 3 J. Wigmore, Evidence §§ 1863, 1904 (1904)). In *Scheffer*, the Supreme Court held that a rule excluding all polygraphic evidence did not violate a defendant's right to present a complete defense because the rule "serve[d] several legitimate interests in the criminal trial process," was "neither arbitrary nor disproportionate in promoting these ends," and did not "implicate a sufficiently weighty interest of the defendant." *Holmes*, 547 U.S. at 326 (quoting *Scheffer*, 523 U.S. at 309). More recently, in *Nevada v. Jackson*, the Supreme Court reversed the Ninth Circuit Court of Appeals and ruled that the state trial court's refusal to admit extrinsic evidence of a victim's prior unsubstantiated allegations did not violate the defendant's right to present a complete defense. 569 U.S. at 505. In the Court's view, the state court decision was properly based on a state statute that had "good reasons" for limiting such evidence and there was no Supreme Court precedent making the rule unconstitutional. *Id*. at 509-10.

A common theme emerges in this Supreme Court jurisprudence: trial courts may not erode a defendant's right to put on her case by applying evidentiary rules that are mechanistic or arbitrary. That is not what happened in Martin's case. The trial court issued

the Preclusion Order excluding evidence or testimony relating to Martin's first trial, the subsequent Rule 32 proceedings, and any prior rulings about State witnesses' credibility or the State's *Brady* violations because "it would be confusing and overly prejudicial … and that most, if not all of this material is not relevant." (Doc. 16-22, p. 28). On appeal, the ACCA found no error in this decision. Citing to Rules 402 and 403 of the Alabama Rules of Evidence and Alabama caselaw concerning admissibility of evidence, the ACCA held that whether to admit evidence of Martin's prior court proceedings and the State's *Brady* violations was soundly within the trial court's discretion, and the trial judge properly excluded the evidence under Alabama evidentiary rules. (Doc. 16-49, p. 16). As acknowledged in *Crane v. Kentucky*, a case Martin cites repeatedly, "the Constitution leaves to the judges who must make [decisions regarding the admissibility of evidence] 'wide latitude' to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, or confusion of the issues'" and "[the Court has] never questioned the power of the States to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." 476 U.S. at 689–90 (citations omitted). With this established Supreme Court law in mind, the undersigned cannot say the Alabama courts' application of Alabama Rules of Evidence 402 and 403 to Martin's proffered evidence was "arbitrary" or "disproportionate" or that that Alabama courts' denial of Martin's Complete Defense Claim resulted in a decision that was contrary to or an unreasonable application of federal law. On the contrary, Supreme Court precedent demonstrates these kinds of evidentiary exclusions are permissible.

Martin broadly suggests habeas relief is warranted because the Preclusion Order "improperly precluded [him] from fleshing out his main defense theory: that the police investigation into the murder was flawed and had improperly disregarded a promising alternate suspect." (Doc. 1, p. 84). The record tells a different story though. Martin *was* permitted to pursue this chosen theory. First, as already explained, the trial court gave Martin broad latitude to cross-examine law enforcement witnesses called both by the State and by Martin himself to test whether the investigation into Hammoleketh's death was flawed, insufficient, or biased against him. Second, the record shows that Martin's counsel voraciously argued to the jury from his opening statement through his closing statement that law enforcement was improperly focused on Martin as a suspect from the beginning, that the subsequent investigation was wrought with ineffectiveness and inconsistencies, and that the trial—occurring decades later through no fault of Martin's—was flawed because witnesses were deceased or lacked memory, and evidence and leads were stale.

To start, Martin's counsel argued in his opening statement:

The Court told you that a delay in time is not caused by Mr. Martin in any way, shape, or form. But the passage of time has had an effect.

Witnesses have died. Witnesses are now too old, too infirm, and unable to come to court to testify.

Some witnesses can't be found or moved. People leave states. People do all kinds of things.

And, finally, as you can well imagine, after 23 years, people's memories of events is not what it was at the time. You'll hear a number of witnesses come in here and actually do not remember a lot of the things that they knew very, very clearly a lot of years ago but they don't remember them now.

(Doc. 16-38, pp. 46-47). Later in the opening, when discussing Mr. Taylor's identification

of Grayling Williams on the photo array and the anonymous call implicating Williams,

defense counsel argued further:

> So now we've got two pieces of evidence pointing to the fact that Grayling
> Williams ought to be talked to, somebody ought to investigate him,
> somebody ought to find out if he had any involvement in this thing.
>
> But what happened was the police had settled on George Martin. They
> didn't want to know about anybody else. They settled on him as being the
> killer of his wife. They haven't heard anything to suggest that he was.
>
> They ignored everything that didn't indicate Mr. Martin. They didn't follow
> any leads, as we'll discuss later. They didn't do any interviews with anybody.
> They had people who lied about things, who changed testimony, who did
> all sorts of things of that sort.

(Doc. 16-38, pp. 51-52); see also Doc. 16-38, p. 54 ("They had decided it was George

Martin and they weren't interested in interviewing anybody else or looking into anything

else.")

Additional examples abound. Continuing on, Martin's counsel argued to the jury

that law enforcement witnesses had lied under oath about whether they found a gas can

at the scene:

> But, in any event, there was a finding of the remains of a gas can by several
> police officers. And some of them tried to weasel out of it. You'll hear that
> one officer had his deposition taken.
>
> A deposition, for those of you that don't know, is testimony taken under oath.
> It's not necessarily in a courtroom. It could be in a lawyer's office. But it's
> the -- the same oath that would be administered, say, by this fine reporter
> right here. It's the same oath even though it's in a lawyer's office.
>
> And he testified that, yeah, they found the remains of a gas can. Then he
> tried to back off it later by saying that he hadn't got his report at the time.
> And when he looked at his report, he could see that there was no gas can
> listed on it. So there couldn't have been one.

> But what he forgot is that I showed him the report and asked him to read it at the deposition very carefully, which he did. And then I asked him whether he saw the remains of a gas can. And he said grudgingly, yeah, he saw something which seems to be the remains of a gas can. That was after he read his report.

(Doc. 16-38, pp. 63-64); (Doc. 16-38, p. 65) (raising inconsistencies from Major Wilbur Williams about the gas can, arguing to the jury that Major Williams had "changed his story completely.")

The trial court also permitted Martin's counsel to argue to the jury that law enforcement had originally found a phonebook at the crime scene but later replaced that phone book with a *Galls* catalog. (Doc. 16-38, pp. 67-68). Defense counsel urged the jury to believe:

> So in an effort to point the finger at Mr. Martin, they had changed the phonebook pages, which was in that can, to Galls pages. You're not supposed to do that. But, trying as they were constantly to point the finger at an innocent man, they manufactured that. That's the Galls catalog.

(Doc. 16-38, p. 68).

Martin's counsel also advocated to the jury that Martin could not pursue his defense because of law enforcement's failed investigation:

> There's no ability to follow the leads we've been talking about because they've all dried up years ago and weren't followed by law enforcement.

(Doc. 16-38, p. 75).

In closing arguments, Martin continued to push his theory that he had been prejudiced by law enforcement's flawed investigation, that law enforcement witnesses were lying, and that the case against him was weak. (Doc. 16-45, pp. 54-99). As to the impact of the passage of time, Martin's counsel argued:

> Mr. Martin is accused of having killed his wife 23 years ago. The Court has told you that in no way, shape, or form is Mr. Martin in any way responsible

for that delay. But the fact remains that key witnesses have died. Key witnesses have disappeared. Key witnesses are now too ill, too infirm to come to court and tell you what they know. And key witnesses understandably, in some instances, their memory is not as good about things that happened 23 years ago.

(Doc. 16-45, p. 55). As to the supposed flawed investigation, Martin's counsel continued to urge the jury to consider the _lack of investigation into Grayling Williams_ as a suspect (Doc. 16-45, p. 67-68); the _lack of investigation into Norma Broach's eyewitness account_ (Doc. 16-45, p. 74-77) ("…They didn't do the investigation. They -- they had settled on that it was George Martin and they were going to wear blinders. They weren't going to look at anything else. And so that was what happened with that."); the _inconsistent statements from law enforcement_ about whether a gas can had been found at the scene (Doc. 16-45, p. 80, 83-84) ("So we had, for the longest time, denials by Mobile Police Department officers that were on the scene that they had, in fact, seen a gas can or I should say the remains of a gas can because it was badly burned in that car. But, ultimately, we were able to get information from them that they had, in fact, seen it. They were reluctant. They changed their testimony more than once. But they ultimately agreed that there was a gas can or the remains of a gas can in the car."); the _failure to preserve evidence_ (Doc. 16-45, p. 85) ("But they did take stuff out of the car and it wasn't recorded. And, to this day, we don't know what it was."); and the potential _evidence tampering_ (Doc. 16-45, pp. 87-89) ("So if there's a switch from a phonebook used by the general public to a Galls catalog used only by a law enforcement officer, the intent would be to point the finger at a law enforcement officer. And, of course, George Martin is a law enforcement officer and George Martin is a subscriber to Galls catalog. So three or four people

identified it as a phonebook, labeled, identified, sent to the Department of Forensic Sciences. Later on, it's opened and now, all of a sudden, it's a Galls catalog.")

In summing up the defense's case, Martin's counsel argued to the jury:

Other potential suspects were never investigated fully. Other leads were not followed.

And those leads now are stone cold and couldn't be followed in any event.

There's stories that have been changed repeatedly by law officers.

The lying that they referred to was done by officers of the Mobile Police Department, not by George Martin, the recanting of sworn testimony, by even of the most senior of Mobile Police Department officers.

(Doc. 16-45, pp. 98-99)

Taken as a whole, this trial record undermines Martin's argument that the Preclusion Order "precluded him from fleshing out his main defense theory" or barred him from "presenting his version of the facts". (Doc. 1, p. 84). Quite the contrary, Martin was given wide latitude to pursue his theory of defense through far-reaching cross-examination of State witnesses and forceful arguments to the jury. There is little doubt in the undersigned's mind that the jury understood that Martin's defense theory was that the investigation was flawed, that law enforcement was biased, evidence had been compromised, and that the State's case against him was weak. Martin was given a constitutionally sufficient opportunity to present his complete defense regardless of any limitations in the Preclusion Order, and his claim for habeas relief fails.

### III. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing § 2254 Cases, the undersigned recommends that a certificate of appealability in this case be granted only as to Martin's Confrontation Claim and Complete Defense Claims. 28 U.S.C. foll. § 2254, Rule 11(a)

("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."). A certificate of appealability should only issue where "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make that showing, Martin must demonstrate that "reasonable jurists could debate whether … the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (internal quotation marks omitted).

Although the undersigned has concluded Martin is not entitled to relief on his Confrontation and Complete Defense Claims, it is the undersigned's view that reasonable jurists could debate whether Martin has made a substantial showing that the Alabama courts denied his rights under the Sixth or Fourteenth Amendments of the Constitution by upholding the Preclusion Order. Accordingly, the undersigned recommends granting a Certificate of Appealability as to the following issues:

1. Whether the Alabama courts' decision to uphold the Preclusion Order was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States, specifically the Confrontation Clause of the Sixth Amendment?

2. Whether the Alabama courts' decision to uphold the Preclusion Order was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States, specifically the Sixth and Fourteenth Amendments of the Constitution and the ensuing right to present a complete defense?

As for Martin's Sufficiency Claim, because it is being dismissed on procedural grounds, *i.e.*, failure to exhaust and procedural default, a COA would only be appropriate if Martin showed both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would

find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. The undersigned does not find it debatable that Martin failed to exhaust his Sufficiency Claim before the Alabama courts, and he is procedurally barred from raising it there now. Accordingly, Martin is not entitled to a certificate of appealability as to this claim.

Rule 11(a) further provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." If there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation. *Brightwell v. Patterson*, CA 11-00165-WS-C, Doc. 14 (order from Eleventh Circuit denying petitioner a certificate of appealability in a case in which this exact procedure was outlined in the report and recommendation); *see also Alexander v. United States*, No. CR 18-00350-KD, 2022 WL 17840415, at *3 (S.D. Ala. Nov. 21, 2022), report and recommendation adopted, No. CR 18-00350-KD-MU, 2022 WL 17834060 (S.D. Ala. Dec. 21, 2022).

## IV. CONCLUSION

In accordance with the foregoing analysis, it is **RECOMMENDED** that Martin's Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Doc. 1) be **DENIED** as to Claim I (the Confrontation Claim) and Claim II (the Complete Defense Claim) and **DISMISSED with prejudice** based on lack of exhaustion and procedural default as to Claim III (the Sufficiency Claim), that the Court find Martin is entitled to a Certificate of Appealability as to his Confrontation and Complete Defense Claims only, and that final judgment be entered accordingly in favor of the State.

## NOTICE OF RIGHT TO FILE OBJECTIONS

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); S.D. Ala. Gen. LR 72(c)(1) & (2). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. To be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this the 18th day of January, 2024.

*s/ P. BRADLEY MURRAY*
UNITED STATES MAGISTRATE JUDGE